**NORTHWEST AIRLINES, INC.,**
**Plaintiff–Appellant,**

v.

**FEDERAL INSURANCE COMPANY,**
**Defendant–Appellee.**

No. 93–2086.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1993.

Decided Aug. 10, 1994.

---

Michael J. Wahoske, Minneapolis, MN, argued (Thomas Tinkham and Christopher J. Riley, on the brief), for appellant.

David L. Hashmall, Minneapolis, MN, argued (Joseph D. O'Brien, Jr., on the brief), for appellee.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, JOHN R. GIBSON,* Senior Circuit Judge, and WOODS,** District Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Northwest Airlines appeals from the district court's [1] entry of summary judgment for Federal Insurance Company in an insurance coverage dispute. Northwest argues that the district court erred in concluding that its claim for insurance coverage from Federal was not covered under the Federal policies because Northwest failed to comply with the policy's reporting requirements. Northwest contends that Federal waived its right to deny coverage on that ground, and that it complied with the policy's reporting requirements. Northwest also argues that the district court erred in holding that the claim at issue was not covered by the policy. Finally, Northwest contends that Federal waived any defense that the claim was not covered. As we conclude the claim was not covered by the policy, we affirm the district court's judgment.

In the early 1980s, Republic Airlines faced a financial crisis. Republic instituted a 15% pay cut for management employees effective September 1, 1983. In December of 1983, Republic instituted several more measures to reduce expenses, including a program called the "Three-Year Partnership Plan for Financial Health and Competitive Strength." Under the Plan, employees agreed to continue the 15% pay cut for three years and work longer hours, and in return, Republic promised to distribute future profits through an employee stock ownership plan.

By 1985, Republic's financial situation began to turn around. Republic created the Employee Stock Ownership Plan for Salaried Employees,[2] and allocated 383,013 shares of common stock and 730 shares of preferred stock and warrants to the Plan. The Plan included eligibility criteria conditioning enrollment in the Plan to management employees employed as of June 30, 1985.

In January 1986, Republic merged with Northwest Airlines, and the shares in the Plan increased in value. On August 5, 1986, a class of former Republic salaried employees sued Republic and Northwest in the District of Columbia, alleging that Republic excluded them from the salaried plan as a result of the June 30, 1985, eligibility date, and this exclusion violated the Employee Retirement Income Security Act of 1974, federal securities law, and state common law.[3] *Harris v. Republic Airlines, Inc.*, Civil No. 86–2147 (D.D.C. filed Aug. 5, 1986).

There are three insurance policies relevant to this dispute. In June 1985, Republic added fiduciary liability coverage to its existing Executive Risk Policy, No. 8108 54 35. The policy had a policy period of December 1, 1984, to December 1, 1985. On February 3, 1986, Federal issued Executive Risk Policy, No. 8108 54 35A, to Republic. The policy had a policy period of December 1, 1985, to December 1, 1986. The merger agreement between Republic and Northwest required Northwest to maintain fiduciary liability insurance policies for five years from the date of the merger to cover acts or omissions of Republic's directors and officers occurring on or before that date, and so Federal issued a policy, No. 8108 54 35B, on August 13, 1986. Policy 35B's stated period was August 13, 1986, to August 13, 1987, with a "retroactive date" of December 1, 1984. Policy 35B terminated coverage under Policy 35A.

In a letter dated November 11, 1987, Northwest formally notified Chubb Group of Insurance Companies, the parent company of Federal and underwriter of the policies, of the *Harris* lawsuit. The letter explained

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

** The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

2. Republic also created six other employee stock ownership plans for other groups of employees.

3. After the district court certified the class, the case was transferred to the United States District Court for the District of Minnesota.

that because of the merger the reporting of the claim had "slipped through the cracks." One of Chubb's claim examiners, Harry Wallace, reviewed the complaint for coverage and discussed the suit with Lowell Osvog from Chubb's Minneapolis office, who had underwritten the policy. Osvog's notes from this conversation include the following:

> Had a claim presented to us 11–87 having been filed 8–6–86. Harry was questioning whether we should accept the claim. We finally agreed that we should under current policy provisions, since we were on the coverages over entire period.

Wallace's notes of the same conversation state:

> He agrees that technically under 8–13–87/88 policy there is no coverage as suit was filed against insured prior to Policy Period as defined. But we were on policy 8–13–86/87—loss just wasn't reported to us then. Slim denial. Accept under 8–13–87/88—take advantage of $250,000 deductible.

On April 11, 1988, Chubb acknowledged receipt of the *Harris* complaint and accepted the claim under policy "8108 54 35" without specifying policy 35, 35A or 35B. Chubb agreed to pay 50% of Northwest's share of defense costs and reserved its right to deny coverage based on three policy exclusions. Chubb also stated:

> The foregoing statements of Federal's position as to the coverage for this matter are premised upon the allegations in the Complaint and presently known facts and are by necessity subject to change as additional allegations and facts are developed through the course of discovery and further pleading. We expressly reserve all rights under the policy and available at law to deny coverage and/or rescind the policy on additional and alternative bases as other terms, conditions, exclusions, endorsements and provisions of the policy, including representations, statements, declarations and omissions in connection with the application therefor, are found to be applicable.

Northwest protested Chubb's decision to pay only 50% of defense costs, arguing that Chubb should pay all defense costs because the alleged wrongdoing related to Republic's acts before the merger.

After negotiations between Chubb and Northwest, Chubb agreed to pay 85% of Northwest's defense costs incurred in defending the *Harris* suit. A memo written by Mark Wade of Chubb acknowledges that "[w]hile there was some delay in notice on [Northwest's] part, we did have notice of the other Northwest matters."

Ultimately, Northwest settled the *Harris* case for a confidential amount, which exceeded the policy limits. Northwest then brought this action against Federal to recover the proceeds under its fiduciary liability policies 35A and 35B. Federal raised several defenses to coverage based on the policy and also for the first time, denied liability based on Northwest's failure "to meet all conditions precedent for coverage." Both sides filed motions for summary judgment.

The district court granted Federal's motion for summary judgment on two grounds. First, the court ruled that Republic failed to comply with the reporting requirements under Policy 35A. *Northwest Airlines, Inc. v. Federal Ins. Co.,* No. 3–91–0228, 1993 WL 729630 at *3 (D.Minn. Jan. 14, 1993). The court rejected Northwest's arguments that Republic and Northwest's failure to give formal notice did not defeat coverage because Federal was not prejudiced, and that Northwest did supply the requisite notice by reporting a similar claim within the policy period. *Id.* at *3–5. The court also denied coverage under Policy 35B, reasoning that the underlying wrongful act occurred before August 13, 1986, the policy's effective date. *Id.* at *5. The court rejected Northwest's argument that Federal waived all defenses not explicitly mentioned in its reservation of rights letter, reasoning that Federal's reservation of rights letter and subsequent correspondence showed that "Federal reserved the right to deny coverage on any and all bases, not just those described in detail in its reservation letter." *Id.* at *6. Second, the court ruled that even if Northwest had reported the *Harris* claim in accordance with the policy terms, Federal was not liable under the policies because the alleged wrongdo-

ing was not a "Wrongful Act" as defined by the policies. *Id.* at *7. Northwest appeals.

## I.

Northwest contends that the district court erred in holding that the claim was not covered by the policies. The district court held that the Partnership Plan did not qualify as a "Sponsored Plan" or a "Benefit Program" as required by the policies, and so, the alleged wrongdoing did not qualify as a "Wrongful Act" as defined by the policies. 1993 WL 729630 at *6–7. Northwest argues that the claim is covered, and that Federal waived its defense based on lack of coverage by failing to specify the defenses in its April 11, 1988, reservation of rights letter or answer to Federal's complaint.

We review the district court's grant of summary judgment *de novo. McKee v. Federal Kemper Life Assurance Co.,* 927 F.2d 326, 328 (8th Cir.1991). Because this is a diversity case, we also review the district court's determination of state law *de novo,* giving the district court decision no deference. *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

## A.

Northwest argues that Republic committed a "Wrongful Act" as required for coverage under policies 35A and 35B. The Federal policy provides coverage for a "Wrongful Act," which is defined as:

(A) any breach of the responsibilities, obligations or duties to a Designated Plan imposed upon the fiduciaries of such plan by the Employee Retirement Income Security Act of 1974 or its amendments or by the common or statutory law of the United States of America or any State or jurisdiction therein.

(B) any other matter claimed against an Insured solely by reason of their (sic) serving as fiduciaries of any Designated Plan.

(C) any negligent act, error or omission in the Administration of any Benefit Program, but shall not include failure of a stock to perform as represented, advice given to an employee to participate or not

to participate in stock subscription plans, or the investment or non-investment of funds.

Northwest contends that it settled the *Harris* case because of concern for its liability under ERISA, and that an insured's good faith settlement of a suit raises a presumption that the insured would have been liable in the underlying action. *See Butler Bros. v. American Fidelity Co.,* 120 Minn. 157, 139 N.W. 355, 359–60 (1913). The "Wrongful Act" alleged in the *Harris* suit, however, was Republic's decision to adopt the June 30, 1985, eligibility date. Republic's decision does not fall within any of the three Wrongful Act definitions above.

■ First, the selection of the June 30, 1985, date does not fall within clause (A) or (B) as required for coverage under the Federal policy. When an employer serves as a plan administrator, fiduciary responsibility does not attach to all corporate decisions, but only those decisions the employer makes in its capacity as a plan administrator. *See, e.g., Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1158 (3d Cir.1990); *Trenton v. Scott Paper Co.,* 832 F.2d 806, 808–09 (3d Cir.1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); *Cunha v. Ward Foods, Inc.,* 804 F.2d 1418, 1432 (9th Cir.1986). Republic's selection of the eligibility date was not an action by Republic as a fiduciary, but rather as an employer. The United States District Court for the District of Minnesota so concluded in *Childers v. Northwest Airlines, Inc.,* 688 F.Supp. 1357 (D.Minn.1988). In *Childers,* another group of Republic employees sued Northwest, claiming that Republic breached its fiduciary duties by establishing certain requirements for participation in stock ownership plans and by failing to notify plan participants that accepting promotions could adversely affect their eligibility in the plans. *Id.* at 1360. The district court dismissed the employees' breach of fiduciary duty claim under 29 U.S.C. § 1104, reasoning that Republic was not acting as a fiduciary in establishing plan participation requirements. *Id.* at 1360–61; *see Hozier,* 908 F.2d at 1158–62 (decision to amend terms is not a breach of fiduciary duty because fiduciary duties do not attach to

an employer's decision to amend the plan); *Trenton,* 832 F.2d at 809 (design of plan was "purely a corporate management decision," not a breach of fiduciary decision); *Cunha,* 804 F.2d at 1432–33 (decision to terminate plan is a business decision, not a breach of fiduciary duty).

■ Similarly, the decision to adopt the June 30, 1985, eligibility date does not fall within clause (C) of the policy. First, this act does not qualify as a "negligent act, error or omission in the Administration of any benefit program." The policy defines "Administration" as "giving advice to employees or effecting enrollment, termination or cancellation of employees under Benefit Programs." Republic never gave advice, enrolled, terminated, or cancelled any employee in the Partnership Plan, and thus, there was no "Administration" of the Partnership Plan. As discussed above, the selection of the eligibility date was a corporate decision and did not effect "enrollment, termination or cancellation" in the Partnership Plan.

Second, liability under clause (C) is precluded because the Partnership Plan does not qualify as a "Benefit Program." The policy defines a "Benefit Program" as any "Sponsored Plan"[4] or "Insured Plan." Citing policy provisions and endorsements, Northwest argues that the Partnership Plan qualifies as a "Benefit Program" because it qualifies as: (1) a benefit plan under ERISA; or (2) any other "employee benefit program."

■ To qualify as a "plan, fund, or program" under ERISA, a reasonable person must be able to "ascertain the intended benefits, a class of beneficiaries, source of financ-

ing, and procedures for receiving benefits." *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982); *Harris v. Arkansas Book Co.,* 794 F.2d 358, 360 (8th Cir.1986) (citing and approving *Donovan* factors). Northwest contends that the Partnership Plan satisfies all of the *Donovan* factors. It explains that the intended benefit was profit sharing through a distribution of Republic stock; the beneficiaries were all employees who accepted the plan by continued employment; the source of financing was anticipated future profits; and the procedures for receiving benefits was Republic's establishment of employee stock ownership plans. Northwest also argues that the Partnership Plan qualifies as "any other benefit program" because it specifically refers to various benefits, including profit sharing.

There are a number of cases analyzing whether certain programs qualify as ERISA plans for purposes of ERISA preemption. *See* 21 U.S.C. § 1441(a). Although not cited by either party, these cases are helpful in determining whether the Partnership Plan qualifies as a plan governed by ERISA.[5]

■ For example, in *Fort Halifax Packing Company, Inc. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), a state statute required employers to provide a one-time severance benefit in the event of a plant closing. *Id.* at 5, 107 S.Ct. at 2214. The Supreme Court held that the lump-sum severance payment, triggered by a single event that may never occur, is not a "plan" for purposes of ERISA. *Id.* at 12, 107 S.Ct. at 2217. The Court reached this result first by focusing on the fact that ERISA refers to

---

4. "Sponsored Plan" means "an Employee Benefit Plan:"

    (a) which is operated solely by the Sponsor Organization or jointly by the Sponsor Organization and a labor organization for the benefit of the employees of the Sponsor Organization and which existed at the effective date of this policy or which is created or acquired after the inception of this policy, subject to the provisions of the paragraph 9 and 10; or

    (b) any other plan or program specifically included as a Sponsored Plan and named in Item 6 of the declarations. But Sponsored Plan shall not include any multiemployer plan, as defined in the Employee Retirement Income Security Act of 1974, as amended;

    (c) any other employee benefit program not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, sponsored solely by the Sponsor Organization for the Benefit of the employees of the Sponsor Organization.

    The policy defines "Employee Benefit Plan" as "any plan so defined in the Employee Retirement Income Security Act of 1974, as amended."

5. In particular, the principles from these cases apply with respect to the *Donovan* requirement that a reasonable person be able to ascertain the procedures for receiving benefits. 688 F.2d at 1373.

employee benefit plans, not employee benefits. *Id.* at 7–8, 107 S.Ct. at 2215. Second, the goal of ERISA is to provide a "uniform administrative scheme" for "determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements." *Id.* at 9, 107 S.Ct. at 2216; *see Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990). The Court emphasized that the severance benefit required no "ongoing administrative program to meet the employer's obligation." 482 U.S. at 11, 107 S.Ct. at 2217. "The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits." *Id.* at 12, 107 S.Ct. at 2218. Although the lump sum severance benefit is different than the Partnership Plan here, the Partnership Plan, like the severance benefit, required no administrative scheme.[6] *See Fontenot v. NL Indus., Inc.,* 953 F.2d 960, 962–63 (5th Cir. 1992) (severance plan not an ERISA plan because it required no "administrative scheme"); *Wells v. General Motors Corp.,* 881 F.2d 166, 176 (5th Cir.1989) (Voluntary Termination Of Employment Plan did not qualify as an ERISA plan because plan was not "ongoing" and did not require "continuing administration"), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990); *see also Harris v. Arkansas Book Co.,* 794 F.2d 358, 360–61 (8th Cir.1986) (promise to establish a plan is not a plan or program). The majority of the written Partnership Plan document discusses wage and productivity concessions and other cost-savings measures. Indeed, the stated purpose of the Partnership Plan was "to help restore Republic to sound financial condition and permit it to meet the challenges of new low-fare competition." As the district court pointed out, "[a]t most, the Partnership Plan was a promise to create an employee benefit plan." 1993 WL 729630 at *7. The Plan does not qualify as an employee benefit plan governed by ERISA. In short, the Partnership Plan did not trigger any sort of administrative requirements with respect to determining plan eligibility, disbursements, funding, or record-keeping.

The Second Circuit's decision in *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320 (2d Cir.1985), is not contrary to our conclusion. There, the Second Circuit held that an unfunded severance pay policy constituted an "employee welfare benefit plan" under ERISA. *Id.* at 325. The severance policy in *Gilbert,* however, contained specific eligibility requirements and provisions for benefit determination. *Id.* at 323; *see Donovan,* 688 F.2d at 1373; *Williams v. Wright,* 927 F.2d 1540 (11th Cir.1991).

We cannot conclude that referring to a potential employee benefit is enough to establish a "Benefit Program" as defined in the policy.[7] Federal cites no authority suggesting that the Plan qualifies as such, and we are persuaded that to qualify as a benefit program under state or common law, there must be a "program," not just a reference to an employee benefit. *See Monarch Cement Co. v. Lone Star Indus., Inc.,* 982 F.2d 1448, 1452–53 (10th Cir.1992) (Sale Agreement which referred to pension benefit was a state law contract, not an employee benefit plan).

**B.**

Northwest next argues that Federal waived any defense that the Partnership

---

6. The "Profit Sharing" section of the Partnership Plan states that employees may acquire future profits through an Employee Stock Ownership Plan, and provides for vesting of stock "in the same ratio to the total stock purchased as that employee's compensation is to compensation paid to all employees." The Plan itself, demonstrates that any administration or determination of benefits will be made when the stock ownership plan is created, and even at that time, the determination of benefits may be self-executing.

7. Federal also argues that we may affirm the district court's judgment based on other grounds not reached by the district court, namely, that coverage is barred: (1) by the "benefits due" policy exclusion; (2) because Northwest gained a profit or advantage to which it was not legally entitled; and (3) because Northwest failed to disclose the claim in obtaining Endorsement 6 from August 13, 1987, to August 13, 1988. In light of our decision, we need not decide whether these policy provisions preclude coverage.

Plan was not a covered plan under the policies. Northwest contends that Federal raised this defense for the first time in its memorandum in opposition to Northwest's motion for summary judgment, and failed to specifically raise the defense in its reservation of rights letter or answer to Northwest's complaint. Federal responds that Northwest's waiver argument is "frivolous" because Northwest never argued waiver to the district court, and because it adequately preserved its policy defenses in its reservation of rights letter, subsequent correspondence, and answer to Northwest's complaint.

■ We conclude that Federal did not waive its right to deny coverage. First, Northwest failed to oppose Federal's summary judgment motion filed in the district court on the ground of waiver. Second, we believe that Federal adequately preserved its policy defenses.

Although Federal could have been far more specific in its April 11, 1988, reservation of rights letter, Federal did reserve its right to deny coverage "on additional and alternative bases." Moreover, correspondence after April 11, 1988, shows that Federal renounced coverage for the *Harris* claim under the policy. In a letter dated October 25, 1990, Federal's counsel stated that the *Harris* claim challenged "plan design" for which there was no coverage, because Republic was acting as an employer, not as a fiduciary. The letter also disclaimed coverage on the ground that Republic's actions did not constitute a "Wrongful Act" under the policy and that the actions in the complaint did not constitute a "negligent act, error or omission in administration of any Benefit Program." Northwest concedes that "Federal consistently denied a duty to indemnify Northwest."

The Minnesota Supreme Court indicated in *St. Paul School District v. Columbia Transit Corporation*, 321 N.W.2d 41 (Minn.1982), that absent prejudice to the insured, a late reservation of rights will not result in a waiver of the insurer's right to assert a policy exclusion. *Id.* at 47. In *Columbia Transit*, the insurer did not give notice to its insured of its reservation of rights until shortly before trial. *Id.* The court reasoned that the late notice did not prejudice the insured's counsel from controlling the defense, and the insurer was not estopped from asserting the exclusion. *Id.* See also *Bettinger v. Northwestern Nat. Cas. Co.*, 213 F.2d 200, 205 (8th Cir.) (only when insurer unqualifiedly assumes and conducts the defense of an action against its assured is it estopped by a judgment against him), *cert. denied*, 348 U.S. 856, 75 S.Ct. 80, 99 L.Ed. 674 (1954); *Iowa Nat'l Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 464 N.W.2d 564, 568 (Minn.Ct.App.1990) (insurer estopped from denying liability when insurer assumes exclusive control and conducts defense against its insured). Northwest does not argue that it was prejudiced or that Federal controlled the *Harris* litigation. Federal's only involvement in the *Harris* case was to pay Northwest's share of defense costs. Indeed, Northwest agreed that the settlement of the *Harris* claim, which it negotiated, was "advantageous."

We recognize that the Minnesota Supreme Court held that the insurer waived its defense of noncoverage in *Faber v. Roelofs*, 311 Minn. 428, 250 N.W.2d 817 (1977). In that case, however, it did so because the insurer never reserved its right to deny coverage and took control and dominion of the defense of the action. *Id.* 250 N.W.2d at 817. The court acknowledged the "majority rule" that the insurer is estopped or waives its coverage defense when the insurer assumes and directs the defense of the action against its insured. *Id.* at 817 n. 2; *see also Boulet v. Millers Mut. Ins. Ass'n*, 362 F.2d 619, 622 (8th Cir.1966).

■ Finally, we believe there is other authority in which to reject Northwest's claim of waiver. We concluded in Part I, *supra*, that no coverage exists under the policies. In general, waiver cannot be used to bring within the coverage of an insurance policy risks not covered by its terms. *See generally* Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 6.7(b) (1988); John A. Appleman & Jean A. Appleman, *Insurance Law and Practice* § 9090 (1981 & 1993 Supp.). Although not argued by Federal, there is authority leading us to conclude this is the law in Minnesota.

For example, the Minnesota Court of Appeals held in *Malakowsky v. Johannsen*, 374 N.W.2d 816 (Minn.Ct.App.1985), that the insurer was not estopped from denying coverage based on a policy exclusion it did not include in its initial reservation of rights letter but that it referred to in a later letter. *Id.* at 817–18. This is similar to the situation before us, as the denial letter, general in its language, was followed by a later letter dated October 25, 1990, specifically reserving the right to deny coverage based on the policy's coverage provisions. The court held that "[e]stoppel may not be used to expand the scope of coverage under an insurance contract." *Id.* at 819. In reaching its conclusion, *Malakowsky* relied on *Shannon v. Great American Insurance Company*, 276 N.W.2d 77 (Minn.1979). In that case, the court rejected the argument that an insurer's offer to settle a claim in excess of the policy limits constituted a waiver of the stated policy limits. *Id.* at 78. "[E]stoppel may not be used to enlarge the coverage of an insurance policy.... [i]t would be wholly improper to impose coverage liability upon an insurer for a risk not specifically undertaken for which no consideration has been paid." *Id.* (citations omitted). Similarly, in *Continental Insurance Company v. Bergquist*, 400 N.W.2d 199 (Minn.Ct.App.1987), the Minnesota Court of Appeals held that the insurer may be able to raise the affirmative defense that the insured's injuries occurred before the policies' effective dates, even if the insurer failed to adequately plead the defense. *Id.* at 201. The court reiterated that it should not impose liability coverage "for risks [the insurer] did not undertake and which were not paid for." *Id.; see Riteway Carriers, Inc. v. Stuyvesant Ins. Co.*, 114 F.Supp. 507 (D.Minn.1953), *aff'd*, 213 F.2d 576 (8th Cir. 1954) (generally a contract of insurance cannot be extended by waiver); *Minnesota Fed'l Sav. & Loan Ass'n v. Iowa Nat. Mut. Ins. Co.*, 372 N.W.2d 763, 767 (Minn.Ct.App.1985) (same).

For these reasons, we reject Northwest's argument that Federal waived its policy defenses.

**II.**

Northwest also attacks, on numerous grounds, the district court's conclusion that Northwest did not satisfy the policy's reporting requirements. Northwest contends that it complied with the policy's reporting requirements by: (1) reporting the "Wrongful Act" to the insurer within the policy period; (2) providing notice of the *Harris* claim during the policy's "extended reporting period." Alternatively, Northwest argues the district court erred in requiring that Northwest strictly comply with the policy's notice provision because Federal suffered no prejudice. Finally, Northwest argues that Federal waived the defense based on the policy period as a matter of law, or there is at least a question of fact as to whether Federal waived the defense.

In light of our holding that there was no coverage under the policies, we need not decide whether Northwest satisfied the policy's reporting requirements.

We affirm the district court's judgment.